```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5     ---------------------------------------
                                          :
 6     JOHN KINLAW                        :    Civil Action No.
                                          :    3:17CV772
 7     vs.                                :
                                          :
 8     DR. CHARLES NWAOKOCHA, in his      :
       individual capacity, et al.        :    June 26, 2019
 9                                        :
       ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13               UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

     Andrew R. Tate, Esquire
16   NCH, LLC
     44 Broad Street
17   Suite 200
     Atlanta, Georgia  30303
18   Counsel for the plaintiff

19   Christopher F. Quirk, Esquire
     Edward J. McNelis, III, Esquire
20   Sands Anderson, PC
     1111 East Main Street
21   Suite 2300
     Richmond, Virginia  23219

22

23

24              Peppy Peterson, RPR
               Official Court Reporter
25          United States District Court
```

```
 1                    P R O C E E D I N G S

 2

 3              THE CLERK:  Case number 3:17CV772, John Kinlaw versus

 4    Dr. Charles Nwaokocha, et al.  The plaintiff is represented by

 5    Andrew Tate.  The defendants are represented by Christopher

 6    Quirk and Edward McNelis, III.  Are counsel ready to proceed?

 7              MR. TATE:  Yes, I am.

 8              MR. QUIRK:  Yes, ma'am.

 9              MR. McNELIS:  Yes, Your Honor.

10              THE COURT:  The first thing is the defendant's motion

11    to exclude causation opinion of Dr. Katz, number 101.  Is that

12    right?

13              MR. QUIRK:  Yes, Your Honor.

14              THE COURT:  All right, sir.  I'll hear your motion.

15    Your argument, excuse me.

16              MR. QUIRK:  Good morning, Your Honor.  My name is

17    Chris Quirk.  I represent Dr. Nwaokocha and Armor in this

18    motion to exclude the causation testimony of plaintiff's

19    expert, Dr. Michael Katz.

20              THE COURT:  All right.

21              MR. QUIRK:  This issue has been briefed, as the Court

22    knows.  So if there are any questions or issues you'd like me

23    to address at the outside, I'm happy to do that.  Otherwise, I

24    will just go into the arguments.

25              THE COURT:  You go right ahead.
```

1          MR. QUIRK:  So, Your Honor, this motion breaks down

2   into two main parts.  One is a state law challenge, and the

3   other one is a federal *Daubert* challenge.  The state law

4   challenge is based upon the fact that Dr. Katz's causation

5   opinion has two down-the-line physicians that he is claiming

6   would have treated the patient in a particular way had they

7   been involved.

8          The first is an emergency room doctor.  Dr. Katz's

9   opinion is that had the plaintiff been sent to the emergency

10  room within three weeks of his injury, he would then be

11  admitted or otherwise made to be seen by a hand surgeon.

12  That's number one.

13         Number two is that after going to the ER, the patient

14  would then be seen by a hand surgeon who would perform some

15  hand surgery to correct his injury to his proximal phalanx.

16  With this causation opinion, Dr. Katz is implicating two

17  standards of care for which he is not qualified to testify to.

18  The first one is the ER doctor standard of care.  We argue that

19  under 8.01-581.20, the applicable method of qualification for

20  an expert on any standard of care, including in this case for

21  the causation opinions, would require Dr. Katz to have had

22  knowledge of and active clinical practice in both emergency

23  medicine and as a hand surgeon.

24         Facts show, the record shows that Dr. Katz did not

25  have such active clinical practice in either specialty, and

4

1    because of that, he is not qualified to render any opinions as

2    to how a reasonably prudent emergency room doctor --

3                THE COURT:  How does the law on standard of care

4    operate to preclude an opinion not on the standard of care but

5    on causation of the injury?

6                MR. QUIRK:  Your Honor --

7                THE COURT:  That seems to me to be a fundamental

8    disconnect between the case law on which you rely and the

9    argument on which you seek to exclude Dr. Katz's opinions.

10               MR. QUIRK:  Your Honor, I understand the question.

11   Under the statute, it doesn't specifically discuss for

12   causation opinions --

13               THE COURT:  It's a standard of care statute, is it

14   not?

15               MR. QUIRK:  Yes, Your Honor.

16               THE COURT:  Okay.  So why does governing -- a statute

17   governing the standard of care come into play and -- control,

18   excuse me, the decision whether to exclude testimony not on the

19   standard of care but on causation?

20               MR. QUIRK:  Well, Your Honor, I think the first part

21   to answering that question is that there certainly must be some

22   standard.

23               THE COURT:  That's not the issue, because you haven't

24   made it the issue.  The issue that you are here to fight about

25   is to strike the causation opinion.  I don't see in the cases

1   that you have cited any opinion of the Virginia Supreme Court

2   or a federal court where that statute has been applied as the

3   analytical calculus for trying to strike a motion on whether

4   there's causation.  Did I misread your papers and the cases?

5   Is there a case, for example?

6           MR. QUIRK:  Your Honor, I was unable to find a case

7   where the Virginia Supreme Court applied the 8.01-581.20

8   statute to a motion to exclude an expert for not having

9   specialization in the area where he's claiming a down-the-road

10  physician would have corrected a plaintiff's problem.

11          THE COURT:  This is very much like a case dealt with

12  by Judge Ellis, isn't it?  You said there's a difference

13  between causation and standard of care, and the statute applies

14  to the standard of care issue, not the causation issue.  Isn't

15  that right in his opinion?

16          MR. QUIRK:  Judge Ellis's opinion, which case is

17  that, Your Honor, if I may ask?  Your Honor, if I may, is that

18  the *N.O. v. Alembik* case, Eastern District of Virginia, 2016?

19          THE COURT:  I think it is.  I had it right here, and

20  I can't find it right now.  I think it's Dungeons or something

21  like that.  *Dunston*.

22          MR. QUIRK:  Excuse me, Your Honor?

23          THE COURT:  *Dunston*.

24          MR. QUIRK:  You'll have to forgive me, Your Honor.  I

25  don't know if I have that case on me right now to argue.

1          THE COURT:  All right.

2          MR. QUIRK:  Specifically what was said in that

3     opinion.

4          THE COURT:  All right.

5          MR. QUIRK:  Our argument is as follows:  That while

6     we are unable to find an opinion where the Virginia Supreme

7     Court applied 8.01-581.20 to a situation such as this, that

8     8.01-581.20 is the only standard for evaluating whether an

9     expert is qualified to testify to a standard of care for

10    another physician.

11          As such, if the Court agrees that Dr. Katz would have

12    to know the standard of care for an ER doctor or a hand surgeon

13    in order to say what a reasonably prudent ER doctor or hand

14    surgeon would have done under the circumstances, 8.01.581.20 is

15    the only statute that provides for such a standard and that if

16    you look at the cases where causation opinions have come up in

17    the past where it's under a lost chance doctrine, the most

18    common scenario where the theory of liability is that had the

19    defendant referred the patient to a cardiologist or some other

20    specialist, that somebody in that field, the cardiologist, for

21    example, would have run some tests and treated the patient

22    differently and saved the patient's life or reduced the chance

23    of fatality from the ailment.

24          In those cases you see that the plaintiffs who are

25    making that point are using doctors in the exact same specialty

1  for the hypothetical foregone doctor.  I think that that shows

2  that the -- it's natural for when you are discussing what other

3  doctors would have done as your causation opinion that you

4  would have to show, through admissible evidence, what the

5  standard of care is for those doctors, and there's no reason

6  why that same standard under 8.01-581.20 as it applies to

7  defendants for standard of care opinion wouldn't apply in the

8  case of a causation opinion that implicates the standard of

9  care.

10           THE COURT:  Why?  Why would you bring a state statute

11  into expert -- to govern -- that's on standard of care into the

12  assessment of causation in a federal trial?  Why wouldn't you

13  consider that under the *Daubert* analysis?

14           MR. QUIRK:  We brought a *Daubert* analysis --

15           THE COURT:  That's not the question I just asked.

16  The question is, why do I have to face your smelted standard of

17  care/causation argument at all given that there's not a single

18  case in which anybody has ever done that that's been cited to

19  me and in which Judge Ellis, in the *Dunston* opinion, writes --

20  it's D-u-n-s-t-o-n against Huang, H-u-a-n-g -- very extensively

21  explained why you shouldn't do that.  To me, that's the proper

22  analysis.  Then you look at the question of whether his

23  causation opinion stands or falls on the basis of the *Daubert*

24  analysis it looks to me like.

25           MR. QUIRK:  So for *Daubert*, I think that the reason

1    we kept them separate from this analysis is that expert

2    qualification for standard of care is the substantive state law

3    analysis, and so --

4              THE COURT:  But the point is that you are relying on

5    a standard of care statute and trying to strike somebody's

6    testimony that's not on the standard of care.  It's causation,

7    and it seems to me I look at the *Daubert* test to assess that,

8    whether the causation opinion can be given or not, it seems to

9    me.

10             MR. QUIRK:  I understand your point.  So under

11   *Daubert*, if we framed it differently, this would be under the

12   reliability analysis, whether the testimony is reliable given

13   the plaintiff's expert's unfamiliarity with the standard of

14   care.

15             THE COURT:  I understand that argument.

16             MR. QUIRK:  Okay.

17             THE COURT:  But I don't understand why you and I

18   pronounce D-a-u-b-e-r-t differently.  Have you done any

19   research as to the proper pronunciation of that person's name?

20             MR. QUIRK:  I know it's French, and so the T should

21   be silent, but I've heard it pronounced different ways.  I

22   usually wait to hear the judge say it one way, and I obviously

23   misheard --

24             THE COURT:  I say it both ways.  At one point in

25   time, I actually did look it up, and now I've forgotten what's

1    the right way to do it.  And I heard a presentation by one of

2    the lawyers who argued the case, and I don't know whether it

3    was in the trial level or the Supreme Court, and I listened to

4    the pronunciation, and that person pronounced it two different

5    ways, too.

6            All right, I understand that part of your analysis as

7    to the causation, how that issue fits in as reliability.  Do

8    you want to go ahead on the rest of your *Daubert* analysis.

9            MR. QUIRK:  Okay.  To import that argument into the

10   *Daubert* analysis, I think that when you look for reliability

11   for an expert's opinion, you're going to want to look to the

12   substantive state law for how state courts have tested whether

13   an expert is qualified to testify to a specific standard of

14   care, and the only evidence of that that I could find was in

15   the context of a defendant's or plaintiff's expert as to the

16   defendant's standard of care.

17           But without an alternative test for determining the

18   admissibility of a standard of care opinion in Virginia, I

19   think it stands to reason that the standard under 8.01-581.20

20   would be the same, because the overall purpose of these

21   standards is to ensure that there's specialization and

22   authority on the topic specifically with regard to proximate

23   cause.

24           There is definitely a Virginia Supreme Court case on

25   that matter whereby an expert cannot testify to causation

```
 1   outside of his field of knowledge.  And when you get into the

 2   specifics of a standard of care to determine --

 3            THE COURT:  Field of knowledge defined how then?

 4            MR. QUIRK:  So the cases --

 5            THE COURT:  On causation.

 6            MR. QUIRK:  The cases that have brought that up --

 7            THE COURT:  I mean in this case.

 8            MR. QUIRK:  In this case?  I think in this case, you

 9   have two standards of care that we are saying are implicated in

10   the causation analysis.  One is for the ER doctor.  The other

11   one is for the hand surgeon.  In order to determine whether

12   somebody has knowledge in that specific area or what's the

13   question in issue is looking at would that person have -- does

14   that person have knowledge and an active clinical practice in

15   that area.  That's how the Court looks at it for defendants.

16            THE COURT:  Let me ask you something.  Let's suppose

17   that we look at the professor emeritus and the doctor in charge

18   and the doctor after whose name is the neurological institute

19   at the Virginia Commonwealth University, and that doctor is

20   80 years old, and that doctor has done more surgeries of this

21   kind than anybody in the world ever, is regarded as one of the

22   world's most preeminent neurosurgeons, but he's retired, and he

23   doesn't do that anymore, but he's done 10,000 of them, and his

24   success rate is somewhere near a hundred percent.  Are you

25   telling me that because he's retired, he can't testify about
```

1    the question of causation?

2                MR. QUIRK:  I think depending on what his opinion on

3    causation is, there's going to be two different answers.  If

4    his causation opinion is that a failure to receive a certain

5    type of surgery results in a certain type of neurological

6    deficit, we would not make the same argument that his lack of

7    clinical practice precludes him from making --

8                THE COURT:  You couldn't.

9                MR. QUIRK:  Exactly.  We agree.  But if his opinion

10   was that had the patient been sent to a neurologist at UVa or

11   locally, he would have received care X, Y, and Z, I think

12   that's when you start to get into the standard of care

13   analysis --

14               THE COURT:  Why would the doctor not be able to

15   testify as to that?  He has had a thousand cases of the same

16   kind sent to him, this doctor in our hypothetical, and he knows

17   what happens when you get a case like this.  Why couldn't he

18   testify to that?

19               You're saying that because this fellow, Katz, hasn't

20   been actively involved in some of these things, that he's

21   barred from giving an opinion on it.  You don't have any

22   evidence that things have changed in the interim.  You don't

23   have any evidence at all that what would have been done when he

24   was actively practicing as opposed to just keeping up with it

25   and reading about it and talking to other people about it that

1    the world has changed, and so without that evidence, why would

2    this matter be stricken on -- his opinion be stricken on

3    causation?

4            MR. QUIRK:  I think the answer to that question is

5    because if that same expert, or, in this case, if this expert

6    came in and tried to testify to a breach in the standard of

7    care by either an ER physician or hand surgeon, he would not

8    qualify under the state statute.  So that's the standard that

9    we are arguing should apply --

10           THE COURT:  I know.  That brings you full circle back

11   to using the state law standard on standard of care to

12   causation which doesn't fly.  Let me hear from the other side

13   on the motion to disqualify.  I'll hear from you on the summary

14   judgment in a minute.

15           MR. QUIRK:  Your Honor, there were two other points

16   on the *Daubert* that we have not covered yet, the *Daubert* motion

17   on the failure to consider cartilage damage and the metacarpal

18   head fracture.  May I proceed on that, or would you like to --

19           THE COURT:  Go ahead.

20           MR. QUIRK:  Under the *Daubert* standard, the plaintiff

21   was required to put on an expert who used reliable methodology

22   in terms of coming to the conclusion that the plaintiff's cause

23   of injury was from the way his proximal phalanx was treated.

24   And when we raised the challenge, the burden shifted to the

25   plaintiff to demonstrate that that methodology was sound.

```
1              The challenge we made was on two fronts -- well,

2    three really, but the first two are that he failed to consider

3    the effect of cartilage damage that was immediate and permanent

4    on the plaintiff's finger, and second is that he failed to

5    consider a second injury to the plaintiff's same finger that

6    never healed and required surgical intervention well after the

7    injury that the plaintiff is talking about healed, never

8    considered either one of those as the sole cause of the

9    plaintiff's ultimate need --

10             THE COURT:  Which one of those situations did

11   somebody opine was actually caused by Dr. Nwaokocha?

12             MR. QUIRK:  The plaintiff did not --

13             THE COURT:  In the splinting process, there's

14   testimony that Dr. Nwaokocha actually caused the second injury,

15   the second one of those injuries, isn't there?

16             MR. QUIRK:  So there's three theories of breach in

17   the case.  One is a failure to correlate the second one --

18             THE COURT:  That's not what I asked you.  Isn't there

19   testimony that Nwaokocha caused the condition that you say

20   wasn't considered?

21             MR. QUIRK:  I would have to turn to plaintiff's

22   expert designation to really state what the opinion is, and he

23   summarizes it as such:  In sum, had Dr. Nwaokocha not deviated

24   from the standard of care, and, one, examined Mr. Kinlaw's

25   hand, and, two, sent Mr. Kinlaw to the emergency room so that
```

1   he could be urgently seen by an orthopedist, Mr. Kinlaw would,

2   more likely than not, have been seen by an orthopedist,

3   received an appropriate imaging to include MRI and CT scan and

4   receive surgery within three weeks of his injury.  Dr.

5   Nwaokocha deviated from the standard of care, and these are the

6   reasons that he has poor outcome with limited range of motion,

7   poor strength, poor dexterity, poor grasping abilities, and

8   pain.  That is his causation opinion as disclosed.

9           The reason that that causation opinion is being

10  challenged under *Daubert* is because clearly here the plaintiff

11  is saying that if the patient had been sent to the emergency

12  room and then seen by an orthopedist --

13          THE COURT:  What's the significance of the fact that

14  both Katz and your doctor testify that it's not knowable how

15  much Kinlaw's cartilage was damaged at various points in the

16  process?

17          MR. QUIRK:  I think there's a distinction between the

18  way that our expert's testimony was given and the way it was

19  represented in plaintiff's brief.  Our expert said that it's

20  impossible to know from looking at the initial x-ray how much

21  cartilage damage was done.  That's in part because -- she

22  doesn't say this -- x-rays don't show cartilage damage.  They

23  show bones, they show spacing, and, at that point, two days

24  after the injury, you're not going to see the degradation of

25  cartilage take place whereby you can --

1          THE COURT:  So your person says it's not

2     determinable, and so does Katz.  Then they go on from there.

3          MR. QUIRK:  Our expert says it is determinable when

4     you look at the CT scans that were taken in April, that he did

5     suffer cartilage damage --

6          THE COURT:  But your man didn't give a CT scan until

7     months later.  This guy -- your fellow said, oh, this is no big

8     deal, this is not urgent, and he didn't do anything.  God

9     forbid that you suffer a problem under the care of a doctor

10    like this, because your hand could end up in the same position

11    is the theory of the position.

12         MR. QUIRK:  That is the plaintiff's theory, and the

13    plaintiff's theory is confined to the 26(a)(2) disclosures of

14    his expert, and his expert has an opinion, and he confirmed it

15    in his deposition, that he believes the plaintiff's proximal

16    phalanx injury, which is one of the two bone fractures that

17    occurred in this case, was the way it was treated, and the

18    failure to have it surgically repaired caused the plaintiff's

19    ultimate injuries.  It's plainly written as the way I just read

20    it.

21         So I think we have to go on that, and the fact is

22    that we raised two issues.  One is that he didn't consider

23    cartilage damage.  To answer your previous question, our expert

24    opines that she could and she did believe that the plaintiff

25    probably suffered some cartilage damage at the outset, at the

1    time of his injury.  She bases that on the CT scan.

2            Whether Dr. Nwaokocha should have gotten that CT scan

3    earlier is not material to whether our expert has an opinion

4    about whether there was cartilage damage.  That's a standard of

5    care question.  So I think --

6            THE COURT:  All right, I understand your argument.

7            MR. QUIRK:  The plaintiff had a responsibility to

8    say, okay, fine, you are raising the cartilage issue --

9            THE COURT:  Suppose that I give him an opportunity to

10   get all the experts that they need to fill in, just continue

11   the case.  Would you then be nit-picking that as long as they

12   filled in the gaps with other experts?

13           There's a point at which the jury has to decide

14   things.  You can't always win cases on the papers, and the

15   Fourth Circuit has made that abundantly clear.

16           MR. QUIRK:  I understand, Your Honor, and I think

17   that part of the challenge here is balancing what's fair for

18   Mr. Kinlaw and what's prescribed under the law.  The United

19   States Supreme Court, under *Daubert*, says that you must have a

20   reliable method, and the Fourth Circuit has interpreted that to

21   say that when you have a challenge to the methodology,

22   especially when it's a differential diagnosis, you must account

23   for the alternative causes that are raised by the challenging

24   party.

25           There's no evidence and there's nothing in the

1   response showing that Dr. Katz considered or has any opinion

2   whatsoever on cartilage or on the metacarpal --

3        THE COURT:  How does the cartilage have anything to

4   do with the cause of the injury?

5        MR. QUIRK:  So if you look at --

6        THE COURT:  Your lady doesn't say that at all,

7   explain that at all that I can tell.  Maybe you can help me.  I

8   may just not know the medicine well enough, and I probably

9   don't.

10        MR. QUIRK:  So the way cartilage damage comes --

11        THE COURT:  That's just something that you threw up

12  in the air is the cartilage, and, oh, there's some cartilage

13  damage there.  And so the -- and *a fortiori* the opinion fails

14  because he didn't have an opinion on it even though in the very

15  next question when he says I don't have an opinion on the

16  effect of the cartilage, he said, I do have an opinion on the

17  cause, however, of where he is today.  I don't understand how

18  you get out of that, and I think you are parsing the testimony

19  so finely that it's hard for me to sort out.

20        MR. QUIRK:  Your Honor, I think that the key is that

21  the plaintiff's expert used differential diagnosis to come to

22  his conclusion.  There can be multiple causes.  In this case,

23  he has an opinion that the way the proximal phalanx was treated

24  was a cause, and, in his opinion, it's the only cause he

25  identifies.  What he raises is that we got two other causes

1   here, cartilage damage immediately that --

2           THE COURT:  You have one cartilage damage that your

3   expert says you can't tell anything about at the critical time.

4   The only time you could tell anything about the cartilage is if

5   there's a CT scan or an MRI, and the problem is your guy didn't

6   get that done.  So now you want to say that their expert's

7   opinion as to causation at the proper point in time is based on

8   something that wasn't knowable until something was done that

9   your guy didn't do.

10          Now, that is a truly bizarre legal theory as far as

11  I'm concerned.  Now, the head fracture, I don't think your

12  argument flies on the cartilage.  What about the intraarticular

13  fracture of the -- what section is it? -- the metacarpal head

14  fracture.

15          MR. QUIRK:  Yes, Your Honor.

16          THE COURT:  Your fellow knew about that.

17          MR. QUIRK:  I'm sorry, Your Honor?

18          THE COURT:  Your fellow knew about that at the time

19  he delayed treatment, didn't he?

20          MR. QUIRK:  Your Honor, first, we would object that

21  he delayed treatment.  I think --

22          THE COURT:  He did delay treatment from the

23  standpoint of summary judgment and *Daubert*.  I have to give

24  that benefit to them.

25          MR. QUIRK:  Okay.

1        THE COURT:  Whether he did or not is a fact question

2    for the jury, I suppose, but, at this juncture, I have -- in

3    analyzing your argument, I have to say he knew about it at the

4    time they say the treatment should have been given and was,

5    therefore, delayed.

6        MR. QUIRK:  So, the metacarpal head fracture, under

7    the *Daubert* analysis, the question that the Court needs to ask,

8    I believe, as instructed --

9        THE COURT:  What does your person say is the effect

10   on causation of the metacarpal head facture?  What does your

11   person say about that?

12       MR. QUIRK:  She says that that is the cause of his

13   injury.  That is why he needed the ultimate excision on

14   July 14th, 2017.

15       THE COURT:  When did that injury happen?

16       MR. QUIRK:  When the injury occurred most likely is

17   at the same point, because the impact required in order to

18   create the fourth metacarpal head fracture, there's only one

19   incident in the record, only one reported incident from the

20   plaintiff where that type of force occurred on that finger, and

21   that's on November 19th, 2016.

22       THE COURT:  So if a case goes to trial and

23   defendant -- and plaintiff says the cause was A, and defendant

24   comes in and finds the cause was B, and the jury says, okay,

25   well, we agree with the defendant's expert the cause was B, but

```
1    it's the very same injury that the plaintiff is talking about

2    that is involved in both causations, can the jury not say,

3    okay, you say the cause is B, but B makes you just as liable as

4    A does, goodbye?

5          MR. QUIRK:  Your Honor, the -- Dr. Katz was asked

6    specifically at his deposition --

7          THE COURT:  I don't care about that right now.  I

8    want to go back to the question I was asking.  You told me that

9    the intraarticular metacarpal head fracture occurred at the

10   same time as the -- there was but one event.  That was when he

11   got hurt the first time and went to see Dr. Nwaokocha.

12         The only difference between Katz and your doctor is

13   it says the injury down the road, the need for the surgery all

14   was caused by the head fracture which happened in the same

15   period of time on the same event as the one that Katz said, and

16   that injury would have necessitated surgery, and, therefore,

17   why couldn't the jury say, okay, maybe we'll take that expert's

18   opinion and go forward on it and the plaintiff wins anyway?

19         MR. QUIRK:  I'll answer that in two parts.  The

20   first, directly answering your question, is that the -- the

21   alleged breach has nothing to do with the fourth metacarpal

22   head fracture.  It's all about the proximal phalanx injury.

23   The only injury that showed up on the 11/21/2016 x-ray was the

24   proximal phalanx injury.  That's where the plaintiff's problem

25   comes in in terms of --
```

1          THE COURT:  Your man knew about the fracture, the

2   metacarpal head fracture, didn't he?

3          MR. QUIRK:  Not until the CT scans and the MRI that

4   were conducted in 2017.  Nobody knew about it.  The radiologist

5   at UVa didn't identify it.

6          THE COURT:  But it occurred when he was hurt the

7   first time, the plaintiff was hurt the first time.  It's

8   not something -- your argument would have some currency, I

9   think, if the proof was that -- or the evidence was that injury

10  occurred five months before when he was doing something else.

11  But that isn't what happened according to your papers.

12          What happened, according to your papers, is he

13  sustained these two injuries at the same time, and had he been

14  sent off to somebody who knew what they were doing, says the

15  plaintiff, everybody would have known this in time to do

16  something about it, and even your doctor says something can be

17  done about it.

18          MR. QUIRK:  Your Honor, I don't think that's the way

19  that causation and breach have to connect in order to prove a

20  prima facie negligence case.  They're bound by their theories

21  of breach in order to show that those breaches caused the

22  plaintiff's ultimate injuries, and Dr. Katz has no opinion

23  admitted under oath about whether the metacarpal head fracture,

24  the fourth metacarpal head fracture and the way it was treated

25  caused any injuries.  Because of that -- because of that, the

1   theory that somehow Dr. Katz --

2          THE COURT:  He says that the cause was X.

3   Immediately after the question when he says you don't have an

4   opinion on that, he says the cause was X.  That, to me, is the

5   same thing as saying I don't think that was the cause, I think

6   that the other thing was the cause.  That's how it shakes out

7   in the testimony it looks to me.

8          MR. QUIRK:  I think that the Fourth Circuit requires,

9   when you have a *Daubert* challenge, it's necessary for the

10  plaintiff's expert to offer a good explanation.  That's quoted,

11  why his conclusions remain reliable.  It also says that --

12         THE COURT:  I'll tell you what.  I think if you want

13  to argue that the Fourth Circuit would do this the other way on

14  your theory, maybe the best thing to do is get the Fourth

15  Circuit to rule on it if I'm wrong about it.  You can take it

16  to them if you feel like it's wrong.  It seems to me like he

17  did give an opinion.

18         You are making the Fourth Circuit's *Daubert* argument

19  a calculus, one of form over substance, I think, in the papers

20  that you submitted, I believe.

21         MR. QUIRK:  If I may conclude --

22         THE COURT:  I need to hear from the other side about

23  this stuff.  Is there anything else that you have?

24         MR. QUIRK:  May I just read one quote from the Fourth

25  Circuit that I believe solidifies the standard in our paper?

```
1              THE COURT:  No.  Have you cited the quote?
2              MR. QUIRK:  Yes, Your Honor.
3              THE COURT:  Then I'll read it.  What case is it?  I
4    don't need for you to read it.
5              MR. QUIRK:  It's the block quote from Westberry,
6    Fourth Circuit --
7              THE COURT:  Famous one from Westberry.  It's the best
8    known quote in Daubert in the Fourth Circuit, I think.
9              MR. QUIRK:  Thank you, Your Honor.
10             MR. TATE:  Good morning, Your Honor.
11             THE COURT:  Good morning.
12             MR. TATE:  Andrew Tate for the plaintiff, John
13   Kinlaw.
14             THE COURT:  Mr. Tate, why didn't you get somebody who
15   was an expert in emergency room medicine, somebody who would
16   have testified to eliminate the points that they're making?
17   Why wouldn't you have done that?
18             MR. TATE:  The law did not require us --
19             THE COURT:  Maybe it doesn't require it, but the
20   difference between what's required by the law and what makes
21   common sense from a lawyer's standpoint is entirely different.
22   If you win and go all the way to the Fourth Circuit, the way
23   this case is postured you could have eliminated every one of
24   the issues simply by getting a different kind of expert.  You
25   didn't do it.  What on earth were you thinking?  You were going
```

1   to get this guy Katz to carry all your water?

2          MR. TATE:  Frankly, Your Honor, my conversations with

3   Dr. Katz, which were extensive, we concluded that his testimony

4   and his opinion was sufficient to testify to the real errors

5   here which was that Dr. Nwaokocha did not take the original

6   injury that was on the x-ray report seriously and did not get

7   him to a specialist.

8          If he had done that, the other injury would have been

9   evident because a CT scan would have been done then, an MRI

10  would have been done then.  Any other damage that had occurred

11  would have been discovered right then.  He didn't do that.

12  That is the problem.  It was his failure to treat what was in

13  front of him.  The fact that there was other damage --

14         THE COURT:  What about this head fracture?

15         MR. TATE:  So there was other damage.

16         THE COURT:  Other damage that was done in the exact

17  same instant that would have been discovered had he been sent

18  to the doctor at the proper time instead of waiting for all

19  that time?

20         MR. TATE:  That's right.  That's what we understand.

21  So had that fracture been -- well, first of all, Dr. Katz has

22  always opined from the beginning that Dr. Nwaokocha, based on

23  the x-ray report saying that Mr. Kinlaw had an intraarticular

24  fracture with a fracture fragment, that he needed to go a

25  specialist because that fracture fragment could cause serious

1  problems.

2          That fracture fragment alone was enough to send him

3  to a specialist where he would have gotten a CT scan, an MRI,

4  which is just standard, and he would have been seen -- the

5  metacarpal head fracture would have been seen then.  He did not

6  do that, and so any other argument that, oh, well, he didn't --

7  Dr. Nwaokocha didn't -- or Dr. Katz didn't testify that Dr.

8  Nwaokocha's failure to treat the metacarpal head fracture was a

9  significant cause of Mr. Kinlaw's injuries, well, no one knew

10  about the metacarpal head fracture because Nwaokocha didn't do

11  anything about the fracture he did know about, nothing that

12  would have been anywhere close to the standard of care which is

13  get this man with a fracture fragment to a specialist by

14  whatever means he could.

15          It is very clear that the defendants are trying to

16  find any possible way --

17          THE COURT:  How long between the time that Dr.

18  Nwaokocha decided to get this man to a specialist did he

19  actually take to get him to a specialist?

20          MR. TATE:  So Dr. Nwaokocha -- Mr. Kinlaw was -- let

21  me try to understand your question.  How long did Dr. Nwaokocha

22  take to get Mr. Kinlaw to a specialist?

23          THE COURT:  Once he decided -- once the doctor

24  decided that a specialist was required, how long did it take

25  for him to get the plaintiff to a specialist?

1          MR. TATE:  So Dr. Nwaokocha saw Mr. Kinlaw on

2    January 3rd for his second visit.  At that visit, Mr. Kinlaw

3    testified that he was begging Dr. Nwaokocha to get him to a

4    specialist, and then Dr. Nwaokocha stormed out of the room,

5    came back, finally said, okay, I'll do it.

6          THE COURT:  The evidence said he stormed out of the

7    room?

8          MR. TATE:  Mr. Kinlaw's testimony that he stormed out

9    of the room.  Dr. Nwaokocha denies that.

10          THE COURT:  So he got mad because somebody questioned

11    his judgment, the patient did?

12          MR. TATE:  That is Mr. Kinlaw's testimony,

13    absolutely.  He was very frustrated, left the room.  The nurse

14    who was in the room at the time --

15          THE COURT:  Leaving the room and storming out of the

16    room are two different things.

17          MR. TATE:  He testified that he stormed out of the

18    room, that he was frustrated with Kinlaw for talking back to

19    him and questioning him.

20          THE COURT:  Did he say anything?  Did the doctor say

21    anything as he stormed out of the room?

22          MR. TATE:  When he came back, Mr. Kinlaw testified

23    that Nwaokocha said, if I really wanted to punish you, I would

24    send you to MCV and it would take -- I'm paraphrasing.  He

25    said, it would take maybe a year to get you an MRI, who knows.

1            THE COURT:  That's very interesting.

2            MR. TATE:  That's Mr. Kinlaw's testimony.  Dr.

3     Nwaokocha denies it, of course.

4            THE COURT:  Was the nurse there when that was said?

5            MR. TATE:  The nurse who was there, it's not clear

6     what her name was.  It's not found in the record, and so we're

7     not sure what she would testify to.  At this point, it's a

8     he-said-he-said scenario.

9            But when Dr. Nwaokocha came back, he agreed, okay,

10    I'll get you -- order an MRI and order you to get out to a

11    specialist.  That was January 3rd.  Dr. Nwaokocha actually put

12    in the papers to make the formal request to get an MRI and an

13    orthopedic surgeon evaluation on January 13th, 10 days later.

14    Mr. Kinlaw got an MRI on January 27th.  Mr. Kinlaw saw an

15    orthopedic surgeon physician's assistant on March 2nd.

16           THE COURT:  What's the reason in the record as to why

17    all that took so long?  If that happened to me, I would have

18    been seen by an orthopedic surgeon the next day.  I can

19    guarantee you that no doctor I see would have let that

20    situation sit unattended for that long, but somebody did.  What

21    is in the record about why that occurred?

22           MR. TATE:  Dr. Nwaokocha says that there was trouble

23    with scheduling, and it wasn't up to him although it's evident

24    on the forms that are used to request the outside appointments

25    that there is different priority levels.  You can request

1    emergent, you can request urgent, you can request priority, and

2    you can request routine.

3              THE COURT:  What did they request for this plaintiff?

4              MR. TATE:  Priority.  Just one step over routine.  I

5    confronted Dr. Nwaokocha with this, and he could not give me a

6    straight answer.

7              THE COURT:  Of the un-straight answers he gave, what

8    did he say?

9              MR. TATE:  He said, well, anything other than

10   priority would have been basically an emergency, sending him to

11   the emergency room.  I said, what about this urgent?  It said

12   urgent within seven days.  You checked priority within 14 days,

13   why didn't you check urgent.  He said, well, I checked

14   priority.  We kept going around in circles about it.  He

15   wouldn't answer.

16             THE COURT:  Okay.

17             MR. TATE:  So the issue is that Dr. Nwaokocha just

18   did not take the injury seriously, and any issue as to --

19             THE COURT:  What evidence do you have about the

20   callousness that you allege with which the doctor addressed the

21   issue which has to do with the counts involving gross

22   negligence and willful and wanton misconduct and a claim of

23   punitive damages attributable under any theory of liability?

24             MR. TATE:  If you'd like me to address that now

25   before they offer their arguments, I'm happy to.

1          THE COURT:  As long as you raised it, I want to hear

2     what you say.

3          MR. TATE:  Certainly.  So Dr. Nwaokocha, the fact

4     that he had so many opportunities to do the right thing, to do

5     something reasonable here and get Mr. Kinlaw to a specialist,

6     to get him seen sooner, from the very outset Dr. Nwaokocha

7     displayed an attitude of complete indifference towards Mr.

8     Kinlaw.

9          THE COURT:  That's a conclusion.  He said it wasn't

10    urgent is one of the evidentiary things.  He said, if I wanted

11    to punish you, I would send you to MCV, and he stormed out of

12    the room first.  He didn't send it on an urgent basis or an

13    emergent basis when he finally decided to specify, didn't seem

14    to know the difference between the two.  What other things,

15    facts do you have that show he was callous the way you say he

16    was?

17         MR. TATE:  Mr. Kinlaw was injured on November 19th.

18    He got his x-ray on November 21st.  Dr. Nwaokocha signed that

19    x-ray report on November 22nd.  An appointment was not -- he

20    said, okay, we'll have an appointment.  He wrote down in the

21    notes, it's written on the notes that he requested an

22    appointment.  The appointment was set for December 6th.  That

23    would have been nearly three weeks after the injury.

24         THE COURT:  Was the evidence that his hand was

25    swollen, that plaintiff's hand was swollen at that time?

1          MR. TATE:  So on November 25th, three days later, Mr.

2    Kinlaw requested, sent in a request to see a nurse or see the

3    doctor, actually, saw the nurse, and there the hand was very

4    swollen.  She wrote that he had no range of motion, the hand

5    was discolored, that it was swollen, and that his pain was a

6    six out of ten, and that he had difficulty sleeping because of

7    the pain.

8          Dr. Nwaokocha signed -- where she wrote that down, he

9    signed that the next day on November 26th.  He didn't see Mr.

10   Kinlaw until November 30th.  He's sitting there in the office

11   November 26th, signing this, does nothing.  There's no evidence

12   he did anything else.  On November 28th --

13         THE COURT:  He didn't tell the nurse, call the guy up

14   and tell him get him back up and let me look at it?

15         MR. TATE:  He did not.  Two days later Mr. Kinlaw

16   sees another nurse, Nurse Banks, at pill call, tells her,

17   listen, my hand, I'm really worried about it, I think I might

18   have permanent damage here, and she says, okay.  And then he

19   writes an emergency grievance about saying he thinks he might

20   have permanent damage and that his hand is in really bad shape.

21         She sees him, and, at that point, his parents had

22   been calling and were very concerned that he had not seen a

23   doctor yet.  At that point, it was nine days after the injury.

24   Still hadn't seen the doctor.  That nurse, Nurse Banks, says

25   that the doctor says there's no urgency, he looked at the x-ray

1  report, and you have an appointment on December 6th.

2           She wrote that he felt a little better knowing that

3  he had an appointment.  The appointment was then moved to

4  November 30th.  There's no evidence that Dr. Nwaokocha had

5  anything to do with moving that appointment.  We think it was

6  actually Nurse Banks, one of these two nurses that had some

7  sympathy for the guy, said, okay --

8           THE COURT:  Advanced him.

9           MR. TATE:  Yes.  And so I believe Ms. Banks testified

10  it's possible that she moved to get -- she really couldn't

11  remember much about everything that happened --

12           THE COURT:  I understand where you are.  Thank you.

13           MR. TATE:  Would you like me to address anything else

14  at this time?

15           THE COURT:  How about the *Daubert* test.

16           MR. TATE:  So with regards --

17           THE COURT:  The failure to address the two

18  alternative causations alleged that they raise.

19           MR. TATE:  Right.  So with regards to the metacarpal

20  head, I think I addressed that a little bit already in the fact

21  that Dr. Nwaokocha -- the defendants argue that Katz had no

22  opinion about Nwaokocha's failure to treat the fracture.  Dr.

23  Katz, his testimony and his opinion from the very beginning is

24  that Dr. Nwaokocha failed to treat the fracture in front of

25  him, and, as a result, all these injuries occurred down the

1  road including his lack of range of motion and unable to close

2  his hand, possibility of amputation which, at this point, is

3  not on the table, thankfully.

4           But, as a result, nothing was done.  That's the

5  problem.  It was Dr. Nwaokocha's failure to treat what was in

6  front of him.  If he had treated what was in front of him to

7  the standard of care to any level of reason, getting someone to

8  a specialist when they've got a floating fragment in their

9  joint, then all these other injuries, the metacarpal head would

10 have been discovered, and he would have got a proper

11 evaluation.

12          THE COURT:  All right.

13          MR. TATE:  With regards to the cartilage damage, so,

14 again, that CT scan wasn't done until five months later.  When

15 that cartilage damage happened, it's not completely clear in

16 the record how it happened.  No expert is a hundred percent, I

17 don't think, on when it happened, but what Dr. Masear, the MRI

18 doctor, did the MRI report, said that there was some cartilage

19 damage but not a lot and that the defect in Mr. Kinlaw's hand

20 should have healed by the time he had an MRI in January if he

21 received appropriate treatment, the defect being the missing

22 part of the metacarpal head.

23          THE COURT:  Is that doctor going to testify?

24          MR. TATE:  So he'll probably -- I think we're

25 stipulating to his testimony by video at this point, but it

1    sort of depends on where these arguments go with you, Your

2    Honor.  I think it's very important what he said.

3              THE COURT:  All right.

4              MR. TATE:  Then I would conclude that the Virginia

5    law does not support their causation arguments.

6              THE COURT:  All right.  Let's hear about the motion

7    for summary judgment.  It depends largely on what happens to

8    the testimony, doesn't it?  Negligence claim, Katz's testimony.

9              MR. QUIRK:  Your Honor, may I briefly touch on a

10   couple points that were just made by plaintiff --

11             THE COURT:  Yes, but, honestly, you have a real

12   knack, Mr. Quirk, of saying the same thing three or four

13   different times and flagellating a dead equine, as Judge

14   Williams used to say.  Get it out quick.  I need to go on with

15   the rest of it so I can follow along.

16             MR. QUIRK:  Yes, Your Honor.  Plaintiff's counsel

17   just described as being a process whereby the defendant or the

18   plaintiff had been sent to an ER he would have gotten a CT

19   scan, other testing that would have identified the fourth

20   metacarpal head fracture and led to revision surgery that would

21   have been appropriate for that.  There is no expert designation

22   that says that.

23             THE COURT:  His testimony says it according to the

24   plaintiff.

25             MR. TATE:  Rule 26(a)(2) requires that opinion be

1    designated.  It's not designated --

2              THE COURT:  That's a new argument that you are

3    bringing up for the first time.

4              MR. QUIRK:  I hadn't heard this argument until today.

5              THE COURT:  It's in the papers.

6              MR. QUIRK:  This argument is not one that can be

7    provided by this expert without massive speculation, and it's

8    not designated.

9              THE COURT:  That's the argument you made in response

10   to it except for the designation part of it.  It's too late to

11   raise that question after we've had all this briefing.

12             MR. QUIRK:  In our reply brief, we mention the

13   designation as being a problem.  Moving --

14             THE COURT:  Let's see the summary judgment.

15             MR. QUIRK:  Judgment motion, part one of that --

16             THE COURT:  Suppose that you lose on the issue of

17   striking Katz's testimony, what happens to the summary judgment

18   motion?

19             MR. QUIRK:  Well, then, the motion -- if the motion

20   *in limine* were denied in part or entirely, then the question

21   becomes -- part B doesn't matter.  Part B to my motion doesn't

22   matter because part B was plaintiff's argument that he doesn't

23   need an expert to prove this type of negligence.  That's a

24   bogus argument under *Beverly Enterprises* --

25             THE COURT:  I think it's not a correct argument, but

1    I don't need -- under the hypothetical I asked you to assume.

2    I asked you to assume, please, that you lose on the causation.

3    What happens to your motion for summary judgment, and you are

4    right, part B of your motion becomes moot.  What about the rest

5    of your motion?

6              MR. QUIRK:  The gross negligence claim and willful

7    and wanton negligence claims are not supported by Virginia law.

8              THE COURT:  What about the facts here?  Don't the

9    facts show, according to the evidence, egregious disregard of

10   the plaintiff's rights?

11             MR. QUIRK:  I'll be happy to go over the facts.

12             THE COURT:  I asked him to do it because I wanted to

13   have it all at one place so I could understand it.  But go

14   ahead.  Tell me what's wrong with what he said.  Your man

15   described it as not urgent, he didn't show any urgency to it.

16   He got mad and stormed out of the room when the guy asked for a

17   doctor, according to the testimony, which your man says didn't

18   happen, and then he delayed the appointment so much so that

19   another nurse had to take compassion on him, the plaintiff, and

20   advance the appointment, and it was forever getting the person

21   to an expert even though his hand was swollen and bruised, and,

22   at one point in time, your man saw the plaintiff and his hand

23   was so swollen there weren't any knuckles showing and your guy

24   didn't even look at, examine the hand, touch the hand, check

25   anything out, and all the signs were there that this was a big

1  deal, that this wasn't some malingering prisoner and that your

2  guy ho-hummed it the whole time.

3       That's basically what his case is.  If that's the

4  case, A, doesn't he get an instruction on punitive damages; B,

5  if he gets an instruction on punitive damages, why isn't that

6  sufficient to meet the requirements for gross negligence and

7  willful and wanton misconduct under Virginia law sufficient to

8  support counts -- what is it? -- count three and four?

9       MR. QUIRK:  Counts two and three, I believe.

10      THE COURT:  Sorry.

11      MR. QUIRK:  To answer your question, the test is not,

12  you know, aggregating the egregiousness of the conduct.  It's

13  did he provide some care.

14      THE COURT:  What care did your guy provide; take an

15  aspirin and call me back?  Giving him a Motrin?  Is that what

16  he did?  That's what they say he did.  What do you call the

17  care your person gave?

18      MR. QUIRK:  So on November 19th, the day of the

19  injury, Dr. Nwaokocha, the record shows, became aware of the

20  injury, ordered an ACE® bandage for the plaintiff, ordered

21  Motrin and an ice pack.  He also ordered the plaintiff undergo

22  an x-ray.

23      On November 21st, the patient underwent an x-ray.

24  The radiology report came back on the 23rd from UVa.  Dr.

25  Nwaokocha read and signed it acknowledging that it was a mildly

1    displaced intraarticular fracture.  From there, he set up a

2    follow-up appointment.

3              As plaintiff's counsel pointed out, the plaintiff

4    made various requests through emergency grievances to nurses

5    saying that his hand was getting worse, would like better care

6    or more immediate care.

7              Nonetheless, that was the 23rd when Dr. Nwaokocha

8    reviewed that radiology report which doesn't say send him to

9    the ER, doesn't say this is a big deal.  It's a mildly

10   displaced intraarticular fracture.  Our expert --

11             THE COURT:  That is the radiologist report.

12             MR. QUIRK:  That's the only thing that Dr. Nwaokocha

13   had it to base it on.  He's not an orthopedist or radiologist.

14   So he takes that as essentially gospel --

15             THE COURT:  Wait a minute.  You are telling me that

16   the radiologist's job is to say, hey, Dr. N, send this person

17   to the emergency room?  I never saw any radiology report that

18   made a substantive recommendation, but there have been a lot of

19   them that I haven't seen.

20             MR. QUIRK:  The point of bringing that up, Your

21   Honor, is he's not disregarding something that's being flashed

22   in front of his face as an emergency.

23             THE COURT:  What about from the time -- he sees the

24   guy is in real trouble and then sits around and does nothing.

25             MR. QUIRK:  He doesn't, though.  He sees him on

 1    November 30th.  So he orders the x-ray on the 19th, reviews it

 2    on the 23rd, sees the patient on the 30th, schedules an

 3    appointment for December.  Patient no-shows, hanging out with

 4    his parents.  I understand that.  They were down for Christmas,

 5    but he no-showed.

 6            Sees the patient again in early January, notices that

 7    his hand is not looking the way it should based on the

 8    radiologist's report from November which he remembered.  He

 9    sets up an appointment with Colonial Orthopaedics who has an

10    orthopedic surgeon that deals with the jail.  The delays --

11            THE COURT:  Your theory is that under Virginia law,

12    whatever you do if you are a doctor that is something, even

13    though it is incompetence, you can't be held liable for gross

14    negligence.

15            MR. QUIRK:  I don't want to create a holding here,

16    but I think that on these facts, what I just described is

17    clearly some care.  He eventually got --

18            THE COURT:  I understand that, but I doubt seriously

19    that unless somebody says just get out of Dodge and I'm sending

20    you out of the emergency room without looking at you, if you

21    ever have a situation where there's no care -- there's always

22    something that the doctor did or didn't do that gives rise to

23    the fight in almost all of the cases except the cases where you

24    kick the guy out.  There's one case, I think, when they got mad

25    at him, he wasn't acting right.

1            So your theory is that no matter how inept the care,

2    as long as there's some care given that there can't be gross

3    negligence or wanton and willful disregard of the rights of the

4    patient.

5            MR. QUIRK:  Our position is that --

6            THE COURT:  Is that what your position --

7            MR. QUIRK:  Our position is the --

8            THE COURT:  Work on the words yes and no.  Wrap your

9    tongue around one of them and give me an explanation.

10           MR. QUIRK:  Our opinion --

11           THE COURT:  No, no.

12           MR. QUIRK:  The answer is yes.  Then the answer must

13   be yes, because that's what *Elliot* says.  *Elliot* says if you

14   provide any care, even scant care, it doesn't matter the

15   quality, doesn't matter how bad the rest of omissions were or

16   how bad every other act was, as long as you provided some care,

17   gross negligence does not go to a jury.

18           So, on the extreme, that's where we are, and I think

19   Dr. Nwaokocha provided clearly some care.  This Court has taken

20   up this case, the *Elliot* case, in *Murray v. Correct Care*

21   *Solutions*, a case before Judge Gibney in 2017.  He opined that

22   in other words, a claim of gross negligence fails when

23   defendants exercise some degree of care.

24           In that case, the doctor called in -- he was told of

25   a patient who had hypoxia, indications of heart failure.  The

1    doctor just called in and said, put him on oxygen

2    supplementation.  Then he came back in on Monday, and the

3    patient was dead.  Judge Gibney said just by making that call

4    telling them to put him on oxygen, under *Elliot*, we're out of

5    the realm of gross negligence.

6            And, so, I think in the medical context, you're going

7    to find it very challenging to prove gross negligence because

8    doctors are constantly providing some care to these patients.

9            THE COURT:  Then there's no cause of action if a

10   doctor looks at him and says, well, let's see.  I see that he

11   has swelling of the extremities, difficulty in breathing, pain

12   radiating down the left arm, a heart -- a blood pressure of 210

13   over 100, and he feels like an elephant is sitting on his

14   chest, and a pulse is 110.  Give that patient a Tylenol and

15   tell him to go home and rest because it will all get better.

16   No gross negligence there according to you; right?

17           MR. QUIRK:  Yes, Your Honor, correct.

18           THE COURT:  That's your theory -- if that's what the

19   Supreme Court of Virginia believes is the law -- I don't read

20   *Elliot* that way, but I'll let the Fourth Circuit find that a

21   circumstance like that constitutes -- gets you out of gross

22   negligence.  Why wouldn't the same situation be willful and

23   wanton even if it's not gross negligence?  Why wouldn't those

24   same facts be a willful and wanton type of neglect, even though

25   it may not pass the gross negligence test because there was

1  some care?

2          MR. QUIRK:  The answer to that is that you can't

3  prove gross negligence -- or you can't prove willful and wanton

4  negligence for the same conduct that does not rise to gross

5  negligence.  It's essentially --

6          THE COURT:  That's a case-specific holding; right?

7  What is the case?

8          MR. QUIRK:  The case is -- I think it's called

9  *Alphonso*.  Let me find it for you.  It is cited by Judge Gibney

10 in the *Murray v. Correct Care Solutions* case, citing to

11 *Alphonso v. Robinson* which is a Virginia Supreme Court case

12 from 1999.  The holding that the defendant who has not

13 committed gross negligence cannot be found to have committed

14 willful and wanton negligence, that's the holding.  If the

15 Court finds no gross negligence, I don't think that there's

16 availability for willful and wanton under that Virginia Supreme

17 Court holding.

18          And to go back real quickly --

19          THE COURT:  That's based on the *Kuykendall* case, is

20 it?

21          MR. QUIRK:  I'm not sure which case *Alphonso* cited

22 to.  I know that Judge Gibney, in the *Murray v. Correct Care

23 Solutions* case --

24          THE COURT:  I don't think that *Alphonso* -- I mean

25 that the cases cited by *Alphonso* actually support that, because

1    I can conjure up just the facts that I gave you whether -- he

2    gave him some care, but it's willful and wanton misconduct to

3    do what he did in that situation in the example.

4            MR. QUIRK:  I think the Virginia Supreme Court said

5    that's not a proper conclusion that you can draw from facts of

6    some care.  They're very explicit.

7            THE COURT:  Each case raising an issue of willful and

8    wanton negligence must be evaluated on its own facts, and the

9    entire conduct must be considered in determining whether

10   actions or omissions present such a question for jury

11   determination according to the *Alphonso* case.  They didn't hold

12   quite as broad as you are talking about, I don't think.

13           MR. QUIRK:  I cited it --

14           THE COURT:  The argument you are making would sort of

15   make a farce out of the notion of punitive damages, for

16   example.  You can't have -- if you look at the instruction you

17   give for punitive damages for your client's conduct, they're

18   functionally the same as a cause of action for willful and

19   wanton misconduct.

20           MR. QUIRK:  Your Honor, this Court has held that if

21   you do not have a cause of action for gross negligence, you

22   cannot support a claim for willful and wanton.

23           THE COURT:  I don't agree with that.  I'm telling you

24   that that is not, I think, a correct statement of the Virginia

25   law.  And if I held it, I was wrong.  I've done further looking

1   at it.

2           MR. QUIRK:  At minimum then, Your Honor, I believe

3   that the Court in *Elliot* -- that opinion is dispositive on this

4   and that some care, even telling a Boy Scout please come back

5   from a sandbar knowing he can't swim in the Rappahannock River,

6   if that's some care, and if our doctor gets x-rays, orders

7   surgery even though it's allegedly delayed, I don't understand

8   how that can be some care and what our doctor provided is none

9   under Virginia Supreme Court precedent, but that would be the

10  conclusion the Court would have to reach if they found *Elliot*

11  did not knock out this gross negligence claim.

12          It would also have to disagree with Judge Gibney in

13  the *Murray* case that underlying cause of action for gross

14  negligence --

15          THE COURT:  I don't agree with the decision in the

16  *Murray* case because the case under *Alphonso* must be decided on

17  its own facts, and that is a categorical generalization of a

18  statement that is inconsistent in *Murray.*  That statement is

19  inconsistent with the command of the Virginia Supreme Court

20  that says decide every case on its own merits.

21          MR. QUIRK:  I don't have the case in front of me,

22  Your Honor, but there are several cases that say willful and

23  wanton negligence is a higher degree, a higher order of

24  negligence.  So it stands to reason that if gross negligence is

25  knocked out by *Elliot*, willful and wanton would logically be

1    knocked out, too.  You couldn't have a claim for simple

2    negligence, willful and wanton negligence but no gross

3    negligence.

4              THE COURT:  All right, thank you.

5              MR. QUIRK:  So that answers the questions on willful

6    and wanton negligence, I believe.  The next issue is punitive

7    damages.  If the Court finds willful and wanton negligence is

8    still available --

9              THE COURT:  He can get punitive damages for just

10   plain negligence, can't he?

11             MR. QUIRK:  I don't think so, Your Honor.

12             THE COURT:  Well, how can we get a message to the

13   medical profession, says the plaintiff, if we can't get

14   punitive damages in a case where the doctor just disregards the

15   interest of the patient?  Is there a case that says you can't

16   get punitive damages in a negligence case?

17             MR. QUIRK:  No, but they could have brought a 1983

18   claim in this case if they felt that the facts supported a

19   deliberate indifference claim which sounds a lot like the facts

20   that plaintiff has cast this case in.  I don't think the facts

21   support that because Dr. Nwaokocha certainly provided multiple

22   episodes of care that ultimately did result in the excision

23   surgery prior to his discharge.

24             That much did happen, so I think when the issue of

25   punitive damages comes up, the question is, well, was it

1    willful and wanton negligence.  If the Court thinks that

2    there's sufficient facts, including considering *Elliot*, to

3    allow willful and wanton negligence to proceed, then we have no

4    argument that punitive damages can't proceed against Dr.

5    Nwaokocha.

6            Against Armor it's slightly different because in

7    order for punitive damages to be awarded under a respondeat

8    superior theory, there must be ratification --

9            THE COURT:  You must have some evidence that the

10   company did something.

11           MR. QUIRK:  Ratification of participation, and

12   there's none of that here.  Plaintiff says that the jury could

13   reasonably infer some ratification by virtue of some testimony

14   about cost savings, but there's nothing in the record showing

15   that anybody from Armor ratified Dr. Nwaokocha's decisions

16   regarding plaintiff's care at any point, nor did they

17   participate in it.

18           So I think Armor should really win on dismissing the

19   availability of punitives for the claims against them through a

20   vicarious liability theory.  Similarly, I think that takes us

21   to vicarious liability overall as a cause of action the

22   plaintiff brings.

23           It's basically the same argument.  Willful and wanton

24   conduct will not give rise to vicarious liability without

25   ratification, so we don't think that there's respondeat

1    superior to Armor for any willful and wanton conduct that's

2    alleged in this case.

3         Conversely, if the plaintiff were to proceed with the

4    simple negligence claim, we have not disputed that she was an

5    employee of Armor and that Armor could be found vicariously

6    liable.  So just a distinction there.

7         Finally, special damages, this is one where the

8    plaintiff expert --

9         THE COURT:  I don't even know what special damages

10   means.  What does that have to --

11        MR. QUIRK:  Special damages are damages that are

12   directly attributable, economic damages to the injury, and so

13   in medical malpractice cases, that's oftentimes medical bills

14   or lost wages.

15        THE COURT:  That's the classic.  What are the special

16   damages --

17        MR. QUIRK:  I don't know, because they have no expert

18   opinion that says what they are.  That was their obligation

19   under Virginia law, is that they must have an expert opinion

20   saying -- well, this is the exact language -- that the medical

21   bills were reasonably necessary in the opinion of experts

22   qualified in the appropriate field to cure the plaintiff.

23        THE COURT:  He didn't have any medical bills.  I

24   thought this was all done by the state.

25        MR. QUIRK:  The plaintiff did eventually go see the

 1   Cleveland Clinic, so I think based on his response, that's

 2   where the plaintiff is saying --

 3           THE COURT:  After he was released.

 4           MR. QUIRK:  Yes, Your Honor.

 5           THE COURT:  Those medical bills.

 6           MR. QUIRK:  Yes, Your Honor.  But there's no expert

 7   opinion, no designated opinion or testimony otherwise that any

 8   of those bills were reasonable or were caused by the negligence

 9   of Nwaokocha.  I think that the line must be drawn at some

10   point where the expert designation and those opinions must

11   accurately reflect the testimony and the substantive arguments

12   that the plaintiff will make.  At this point, all he has are

13   arguments.  He has no facts.

14           THE COURT:  Let me hear --

15           MR. QUIRK:  Thank you, Your Honor.

16           THE COURT:  How do you get around *Elliot*?

17           MR. TATE:  I'd like to make one point about *Elliot* at

18   the outset, Your Honor, and just the facts in that case where a

19   scout master was yelling to a drowning child while the child

20   was drowning.  The scout master -- and that was considered some

21   care.  The scout master did not wait days to yell to the

22   drowning child.  He did not wait weeks to yell to the drowning

23   child.  He yelled at him to come back and to swim in that

24   moment, and that was considered some care.

25           That's a far cry from what Dr. Nwaokocha did when

1    presented with an injury to my client and him waiting days to

2    even see the guy and ignoring the reports that he signed by his

3    own nurses that said, hey, this guy is having trouble sleeping

4    it's so bad, he has no range of motion, it's swollen, his

5    parents keep calling, just completely ignored it.

6              So the facts in *Elliot* are completely distinct, and

7    another point on that is that --

8              THE COURT:  What I want to know is, what is -- you

9    all haven't really done very much on it.  Why does *Elliot* have

10   anything to do in a medical malpractice case at all?  What on

11   earth has it got to do -- has any case applied that issue to

12   whether a doctor has given somebody an aspirin and that's

13   enough to take the situation?

14             This is a general negligence case about whether care

15   was taken at all.  What does it have to do with the medical

16   malpractice area?  I don't see any cases that anybody has cited

17   that show *Elliot* applies to a doctor.  Doctors give care.

18   Whatever they do is care, so *a fortiori* there is going to be,

19   quote, some care.  Some care given by a doctor is not the same

20   thing, in my mind, as care as applicable in the negligence

21   analysis of *Elliot against Carter*.

22             MR. TATE:  I agree with that, Your Honor.

23             THE COURT:  You didn't make that argument, did you?

24             MR. TATE:  One of the arguments we made was about the

25   context of which the gross negligence standard is applied.  You

1    look at someone who is similarly situated, and, in this case,

2    it would be another physician.  I take your point that anything

3    --

4           THE COURT:  As a general proposition, if you see a

5    doctor, you walk in the door, you see a doctor, you are then

6    under, the generic term, the doctor's care.  The doctor does

7    something.  Doctor says, I don't think you are having a heart

8    attack, go home and lie down and it will be better.  The

9    patient dies of a heart attack.  He's given care.

10          Not one of you has cited a single case where *Elliot*

11   applies to medical malpractice that I found.  Maybe I'm wrong

12   about that.

13          MR. TATE:  I don't believe the defendants have

14   cited --

15          THE COURT:  You say you take that up in the context

16   of the gross negligence argument when you argue that you apply

17   *Elliot* in context, and the context of *Elliot* is just different

18   than the context of your case, and, therefore, the rule of

19   *Elliot* doesn't control here because in the context, he really

20   gave what amounted to no care.  Isn't that right?

21          MR. TATE:  That's my understanding, Your Honor.

22          THE COURT:  Let me ask you, why didn't he give some

23   care even though it was inept?

24          MR. TATE:  I think the point is, like I was saying

25   with *Elliot*, when the injury was evident, that's when the

1    plaintiff -- the defendant in *Elliot* provided some care.  He

2    yelled to the drowning child to come back, to swim.  That is

3    when it happened.  The context of when the person knew that

4    something was wrong and when that person acted with some care.

5    Here, there was -- Dr. Nwaokocha took no care.  If he ordered

6    an appointment to see the guy 17 days after the injury, that

7    just cannot be considered some care.

8              THE COURT:  You say that, but what's the authority

9    for that?  I tend to agree with you, but what's the authority

10   for it?

11             MR. TATE:  It's not a question of law whether or not

12   there's gross negligence unless reasonable minds cannot differ.

13   If reasonable minds can differ, it is a jury question.  Here,

14   at the very least, Your Honor can differ on whether or not it

15   was reasonable for Dr. Nwaokocha to wait -- to wait 17 days to

16   give this guy his first appointment.  Whether or not that was

17   considered care, that's a question for the jury.  It's not a

18   question for summary judgment.

19             THE COURT:  All right.  So you get around count two

20   and three dismissal on that argument basically because you have

21   the jury question on gross negligence, and because you do, the

22   circumstances are sufficiently egregious you get a jury

23   question on count three; right?

24             MR. TATE:  That's right.

25             THE COURT:  Thank you.  Anything else on that?

1         MR. TATE:  I just wanted to correct for the record a

2    factual statement that was made that Dr. Nwaokocha had

3    requested a follow-up for Mr. Kinlaw in December.  There's no

4    evidence that I'm aware of that Dr. Nwaokocha requested a

5    follow-up in December --

6         THE COURT:  The nurse did.

7         MR. TATE:  Well, Mr. Kinlaw requested a follow-up in

8    December.  Dr. Nwaokocha said he'll see Mr. Kinlaw again in six

9    to eight weeks on November 30th.  Mr. Kinlaw, in mid December,

10   requested a follow-up, and he had to request another follow-up

11   to get his January appointment.  It wasn't rescheduled by

12   Nwaokocha.

13        THE COURT:  But the nurse didn't do that, too?

14        MR. TATE:  Well, the nurses were the ones fielding

15   the requests.

16        THE COURT:  Okay.

17        MR. TATE:  But it wasn't Dr. Nwaokocha saying, hey,

18   let's go ahead and see you in December, a couple weeks after I

19   saw you before.  That was Mr. Kinlaw.

20        THE COURT:  Okay, thank you.  How does *Elliot* apply

21   in a situation involving a doctor?

22        MR. QUIRK:  I brought this case up prior, Your Honor,

23   but the *Murray v. Correct Care Solution* case is a medical case

24   where this Court applied *Elliot* to the care a doctor provided.

25   So there's nothing in *Elliot* that says that it's confined to

1   any specific --

2           THE COURT:  No, it doesn't, but it is about as crazy

3   a case as I've ever seen applied to a medical situation.  I

4   don't think -- I don't think it's right if that's the holding.

5           MR. QUIRK:  I think *Elliot* --

6           THE COURT:  It's got to be wrong that if a doctor

7   does anything, he can't be guilty of gross negligence.

8           MR. QUIRK:  I understand the Court's concern.

9           THE COURT:  Has the Virginia Supreme Court ever

10  applied *Elliot* to a medical case, medical malpractice case?

11          MR. QUIRK:  I don't know the answer to that question,

12  Your Honor.  I do know that the Virginia Supreme Court in

13  *Elliot* was articulating the standard for gross negligence

14  broadly, and it says some care.  I understand that when we

15  think about doctors --

16          THE COURT:  Think for a minute about the result of

17  that argument.  The scenario I gave you is the classic heart

18  attack.  Every doctor, every nurse, every EMT knows it's a

19  heart attack happening right then.  What the doctor did in my

20  scenario was to say go home and rest.  That isn't an acceptable

21  way of treating a perceived heart attack.  The patient dies.

22          Your view is because he did some care, you want me to

23  hold that because he did some care, he can't be held liable for

24  gross negligence, and that's the antithesis of all the law that

25  I know about about what gross negligence really means.  I think

1    *Elliot* is a case confined to its facts.  I'm not prepared to

2    extend it to doctors, and I don't think that's the rule.

3            MR. QUIRK:  Okay, Your Honor.

4            THE COURT:  I'll let you take it up with the Fourth

5    Circuit, but if they want to rule that way they can rule that

6    way.  But that decision has tremendous portent for all of

7    Virginia and doctors and everywhere in Virginia, and I just

8    don't see it that way, and absent a case from the Supreme Court

9    of Virginia applying *Elliot* in the context of a doctor, I'm not

10   prepared to do that.

11           MR. QUIRK:  Do you think it makes sense to certify

12   that question?

13           THE COURT:  No.  Nothing makes sense to certify

14   anything anymore.  Not in this case.  This case -- you all have

15   been -- have fought every single way you can fight, and you are

16   entitled to, but the case is going to trial.

17           MR. QUIRK:  I understand, Your Honor.

18           THE COURT:  And you're going to trial -- you have a

19   final pretrial conference next week.  You're going to trial on

20   the 16th; right?

21           MR. QUIRK:  Pretrial conference is the 2nd, and the

22   trial starts on the 15th.

23           THE COURT:  15th, yes.

24           MR. QUIRK:  All right, Your Honor.  Thank you for

25   your time.

1          THE COURT:  The motion to dismiss, motion to exclude

2     causation opinions of Michael Katz, ECF number 101, will be

3     denied.  The motion, defendant's renewed motion for summary

4     judgment will be denied.  An opinion will be issued, but I

5     never did appreciate -- I don't know that I can get it by the

6     2nd of July which is your final pretrial conference.

7          You all should be working on all of that now.  And so

8     I want you to know getting ready for the final pretrial

9     conference, and insofar as I'm concerned, both count two and

10    three will be subject to trial for purposes of preparing the

11    pretrial conference, and I will entertain, at the end of the

12    evidence, a motion for judgment as a matter of law on count two

13    and three.  And so I caution you to be careful how you argue

14    the case to the jury at the beginning, both of you.  That's

15    something that can be argued at the end with the proper

16    instructions, and we'll see where this evidence leads.

17         There is some dispute, a good bit of dispute in the

18    evidence about what the doctor did, what his attitude was, what

19    was going on.  So it will have to be tried.  Now, the other --

20    you have a question, Mr. Tate?

21         MR. TATE:  No, Your Honor.

22         THE COURT:  Do you have a question?

23         MR. QUIRK:  Yes, Your Honor.  The special damages

24    issue where Mr. Tate did not respond --

25         THE COURT:  He didn't address that.  I'm sorry.  I

1    need to get him to address that.  What evidence do you have to

2    support -- what are your special damages?  The bills for the

3    Cleveland Clinic?

4               MR. TATE:  Right, Your Honor.

5               THE COURT:  How much are they?

6               MR. TATE:  Mr. Kinlaw was on Medicaid for that

7    procedure and did not pay out of pocket for that.  And so --

8    but --

9               THE COURT:  Doesn't the collateral source rule allow

10   recovery?

11              MR. TATE:  That's my understanding.

12              THE COURT:  How much was it?

13              MR. TATE:  I don't have that number in front of me,

14   Your Honor.

15              THE COURT:  Roughly.

16              MR. TATE:  I really just don't have it.

17              THE COURT:  A million or a hundred?

18              MR. TATE:  It was not a million, Your Honor.

19              THE COURT:  What evidence do you have showing that

20   going to the Cleveland Clinic was necessary and that the amount

21   of the bill is reasonable and was necessarily incurred?  What

22   evidence do you have in the record on that?

23              MR. TATE:  Well, first of all, with regards to

24   whether or not that surgery was necessary, Dr. Katz, in his

25   report, stated that as a result of Dr. Nwaokocha's

1    deviations -- I'm looking at page 20 of 23.

2           THE COURT:  Read it all.

3           MR. TATE:  "Dr. Nwaokocha deviated from his duty by

4    not sending Mr. Kinlaw" --

5           THE COURT:  Slow down.

6           MR. TATE:  "Dr. Nwaokocha deviated from his duty by

7    not sending Mr. Kinlaw to the emergency room for evaluation.

8    As a result, his hand did not heal properly.  He suffered

9    severe pain, and he lost function in that joint.  Based on the

10   clinical evaluation of Dr. Seitz, Mr. Kinlaw received

11   arthrodesis to reduce the pain from his injury" --

12          THE COURT:  Who is Seitz, and arthrodesis, what does

13   that mean?

14          MR. TATE:  Arthrodesis is where you fix a joint in

15   place --

16          THE COURT:  Put it in the context of the damages

17   we're talking about.  Is that the doctor from Cleveland Clinic

18   --

19          MR. TATE:  Yes.  That's the doctor from the Cleveland

20   Clinic who did the surgery after he was released.

21          THE COURT:  So you do have proof that it was

22   necessary.

23          MR. TATE:  Yes.

24          THE COURT:  From Dr. Katz.

25          MR. TATE:  Yes.

1          THE COURT:  Have you got proof as to the

2    reasonableness of the bill?

3          MR. TATE:  So the reasonableness of the bill I don't

4    understand being called into question, and I think --

5          THE COURT:  Did you question -- I thought you

6    questioned, Mr. Quirk, the reasonableness of the bill.

7          MR. QUIRK:  I did challenge the reasonableness of the

8    bill.

9          THE COURT:  You did say there was no evidence about

10   it, and you don't agree with it; right?

11         MR. QUIRK:  There is no evidence.  It's his burden to

12   show the reasonableness.

13         THE COURT:  I understand that, but the way I practice

14   law was that I'd get a bill from somebody and they would look

15   at it.  I could go talk to somebody and say, I don't have a

16   problem with it.  Are you at that point, or do you have dispute

17   as to the reasonableness of the amount?

18         MR. TATE:  Frankly, Your Honor, I don't think we've

19   discussed that bill in detail at all.

20         THE COURT:  That's your job then.  It's your job to

21   say I'm going to have to put on a witness to prove that it's

22   reasonable unless you agree, and, Mr. Quirk, what do you say.

23   Mr. Quirk, it's then up to him to look at the bill and to talk

24   to an expert and say, yeah, that's okay with me, I'll stipulate

25   that it's okay, or, no, I don't think it's reasonable, but I

1   would stipulate what my doctor says is a reasonable amount.

2             MR. TATE:  I think that's something --

3             THE COURT:  Is that the only special damage we're

4   talking about?

5             MR. TATE:  Yes, Your Honor.

6             THE COURT:  Then you all need to sort through it then

7   and see.

8             MR. TATE:  I think we can probably let you know at

9   the pretrial conference what we've come to on that.

10            MR. QUIRK:  I disagree.  I think the posture of this

11  challenge is that they haven't met their burden --

12            THE COURT:  I'm not going to decide it on summary

13  judgment at this time.  If I can decide that on summary

14  judgment, I'll reserve that part of it for pretrial conference,

15  see where you all go.  What is it about lawyers today that they

16  don't talk about these things?  That's how you practice law.

17  You say, hey, I've got these in the way of damages, do you

18  agree or disagree, and then you know exactly where you

19  disagree.  Okay, we'll stipulate to these, but we'll have to

20  litigate over these.  That's just the way things are done.

21            That then makes it unnecessary for courts and juries

22  to have to spend their time fighting over what you all could

23  have agreed upon to begin with, but the process begins with

24  you, Mr. Tate, not with him.

25            MR. TATE:  I understand, Your Honor.

1            THE COURT:  If you want to get recovery for it, the

2      ball is, in the first instance, in your court.  All right.

3      I'll entertain that further at the summary judgment, see what

4      you all have.  He's right, you have to have support for it.  If

5      you've offered no support for it, you lose.  But if he's

6      willing to agree that it's reasonable in amount, then -- and

7      Katz's testimony puts it into play as reasonably necessarily

8      incurred process and expense, then we'll have to deal with it.

9      I'll give you all an opportunity to talk about the matter.

10     Otherwise, we're planning to go to trial on all three counts on

11     July 15th.

12            MR. TATE:  Thank you, Your Honor.

13            THE COURT:  I'll see you at the final pretrial

14     conference.  Sorry, the count against -- you don't have any

15     respondeat superior claim against the company for punitive

16     damages or willful and wanton misconduct because you don't have

17     any evidence of ratification, he says.  Do you have any

18     evidence of ratification or policy and practice that allowed it

19     to go on?

20            MR. TATE:  The only evidence we have is Nurse Banks'

21     testimony about the high cost of emergency room visits and

22     outside doctor specialist visits being the highest costs.  She

23     managed the budget at this particular prison --

24            THE COURT:  The fact the costs are high doesn't mean

25     that there's a policy against sending people or a ratification.

1    The mere evidence of high cost is insufficient to put that

2    issue into play, I think.

3              MR. TATE:  Our argument is that the delay was related

4    to cost.

5              THE COURT:  I know you are arguing it, but what proof

6    do you have?  Did anybody testify that it was delayed because

7    it was expensive?

8              MR. TATE:  I don't think anyone would ever admit that

9    that was the actual policy of the company.

10             THE COURT:  There's whistleblowers and insiders who

11   admit it all the time.

12             MR. TATE:  We have no such whistleblower, Your Honor.

13             THE COURT:  Do you have any evidence from which a

14   jury could reasonably infer that the reason that the medical

15   referral to the emergency room was delayed and the MRIs,

16   etcetera, were delayed was because of the high cost of them?

17             MR. TATE:  I think that goes to the credibility of

18   Dr. Nwaokocha's testimony and whether or not that had

19   anything --

20             THE COURT:  You have to have some evidence from which

21   a jury reasonably could conclude that the cost of it was the

22   cause of the delay.  Do you have any evidence of that?

23             MR. TATE:  I have no direct evidence, Your Honor.

24             THE COURT:  What's your indirect evidence?

25             MR. TATE:  Our circumstantial evidence is Nurse Price

1   saying that the highest costs that she was familiar with in

2   managing the budget at Armor Lunenburg Correctional Center was

3   emergency room visits which our expert says Mr. Kinlaw should

4   have gotten -- he did not -- and outside appointments which Mr.

5   Kinlaw begged for, did not get for about 40 days.  Actually

6   longer than that.  Wasn't ordered for a long time, and then

7   when Dr. Nwaokocha finally ordered one, said, I'll do it, he

8   waited ten more days to do it.

9           THE COURT:  I know, but that's not enough, I don't

10  think.  I'll hear you all, see your evidence at the final

11  pretrial conference about it, but I wouldn't count on it going

12  to the jury on Armor except as to the negligence claim.

13          MR. TATE:  All right, Your Honor.  Thank you.

14          THE COURT:  Do you all need to talk -- what

15  magistrate judge had this case to discuss settlement?

16          MR. McNELIS:  Judge Novak.

17          THE COURT:  Do you need to talk with him any further?

18  If you do, you need to get going.  I don't want to spend a

19  bunch of time on the 2nd of July doing things that aren't

20  necessary if you're going to settle the case.  If you're not,

21  let's get ready to try the case on the 15th.

22

23              (End of proceedings.)

24

25

1

2

3   I certify that the foregoing is a correct transcript

4 from the record of proceedings in the above-entitled matter.

5

6

7 _____/s/_____     _____

8 P. E. Peterson, RPR      Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25