IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHN KINLAW,

    Plaintiff,

v.                                      Civil Action No. 3:17-cv-772

DR. CHARLES NWAOKOCHA,
et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the DEFENDANTS' MOTION TO EXCLUDE THE CAUSATION OPINIONS OF PLAINTIFF'S EXPERT, MICHAEL J. KATZ (the "Motion) (ECF No. 101).[1] For the reasons set forth on the record during the hearing on June 26, 2019 and in this MEMORANDUM OPINION, the Court denied this Motion by an ORDER entered on June 27, 2019 (ECF No. 123).

**BACKGROUND**

**A. General Factual Background**

In this medical malpractice case, John Kinlaw ("Kinlaw") alleges that Defendants, Dr. Charles Nwaokocha ("Dr. Nwaokocha") and Armor Correctional Health Services, Inc. ("Armor") (collectively, the "Defendants") failed properly to treat Kinlaw's broken finger, leading to permanent damage to the finger. See

---

[1] This Opinion does not address the DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (ECF No. 103), which will be addressed in a separate MEMORANDUM OPINION.

Compl. ¶ 1-6 (ECF No. 1). At the time of the alleged malpractice, Kinlaw was incarcerated at Lunenburg Correctional Center ("LCC"). Id. ¶ 1. During the relevant time period, Dr. Nwaokocha was an employee of Armor, which contracted with the Virginia Department of Corrections to provide health care services at LCC. Id. ¶¶ 10, 19.

Kinlaw alleges that Dr. Nwaokocha committed medical malpractice by, inter alia: (1) delaying the treatment of his finger injury; (2) failing to properly stabilize the injury; and (3) failing to promptly refer him to a specialist. See id. ¶¶ 20-90. Kinlaw seeks compensatory damages (including pain and suffering and lost income); damages for lost earning potential; and punitive damages. Id. at 41-42.

**B. Background Relevant To The Motion**

This is the second time that the Court has been asked to address the expert testimony of Kinlaw's expert witness, Michael J. Katz, M.D. ("Dr. Katz"). Previously, the Defendants filed the MOTION TO EXCLUDE TESTIMONY CONTAINED IN THE AMENDED EXPERT REPORT OF MICHAEL J. KATZ, MD, OR, IN THE ALTERNATIVE, MOTION TO STRIKE THE AMENDED EXPERT REPORT OF MICHAEL J. KATZ, MD (ECF No. 52) and the DEFENDANTS' RENEWED MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S STANDARD OF CARE AND CAUSATION EXPERT, MICHAEL J. KATZ (ECF No. 76). After hearing argument on these Motions on April 23, 2019, the Court denied them, and, for the reasons set forth in the

2

Court's MEMORANDUM OPINION (ECF No. 100), allowed the Defendants to re-depose Dr. Katz. See ORDER (ECF No. 91); Mem. Op. (ECF No. 100).[2]

Thereafter, the Defendants re-deposed Dr. Katz on May 16, 2019. See ECF No. 111 at 2. Following this second deposition of Dr. Katz, the Defendants once again moved to exclude Dr. Katz's expert testimony, this time only his opinions related to the causation of Kinlaw's injuries. See ECF No. 101; ECF No. 111; ECF No. 119. The parties fully briefed the Motion and the Court heard oral argument on it on June 26, 2019. For the reasons stated on the record on June 26, 2019, and as set forth below, the Motion was denied. ECF No. 91.

**DISCUSSION**

The Defendants' Motion raises two arguments. First, Dr. Katz's causation opinions must be excluded under Virginia law, they argue. That is so because, under Va. Code § 8.01-581.20(A) and the Supreme Court of Virginia's decision in Dixon v. Sublett, 809 S.E.2d 617 (Va. 2018), Dr. Katz must qualify as a medical expert in emergency medicine and hand surgery in order to offer his causation opinions in this case. He does not qualify as either under Virginia law, Defendants say. Second, Dr. Katz cannot satisfy

---

[2] The Defendants had also filed DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 73), which was denied in perspective of the additional deposition of Dr. Katz. See Mem. Op. at 22-23 (ECF No. 100).

3

the federal Daubert standard because he used unreliable methodology to determine how much of Kinlaw's injury was the result of Dr. Nwaokocha's alleged negligence or which surgery Kinlaw would have received. Kinlaw disputes both arguments.

Each argument will be addressed in turn, and, for the reasons set forth below, both arguments were rejected.

### A. Va. Code § 8.01-581.20 and Sublett Do Not Warrant Exclusion of Dr. Katz's Causation Opinion

There is no dispute that Va. Code § 8.01-581.20 is applied by federal courts sitting in diversity to determine if a medical expert can testify as to the standard of care. See Creekmore v. Maryview Hospital, 662 F.3d 686, 690-91 (4th Cir. 2011) ("[B]ecause the testimony at issue here was required for a medical malpractice claim under Virginia law, the sufficiency of its substance to meet plaintiff's prima facie case is governed by state law."); N.O. v. Alembik, 160 F. Supp. 3d 902, 904-07 (E.D. Va. 2016); Tripiciano v. Hale, No. 7:13cv254, 2014 WL 1653073, *2-3 (W.D. Va. April 23, 2014); Dunston v. Huang, 709 F. Supp. 2d 421, 425 (E.D. Va. 2010).

Nor is there dispute that, to qualify as a standard of care expert under Virginia law, such expert must satisfy both a "knowledge requirement" and an "active clinical practice requirement." See Va. Code § 8.01-581.20; Creekmore, 662 F.3d at 691-92. As to the "knowledge requirement,"

> [it] does not demand an identical level of education or degree of specialization; rather,

4

>it can be shown by "evidence that the standard of care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant doctor's specialty."

Creekmore, 662 F.3d at 691 (quoting Jackson v. Qureshi, 277 Va. 114, 122, 671 S.E.2d 163, 167 (2009)). The active clinical practice requirement" concerns

>the relevant medical procedure at issue in a case or, more specifically, the actual performance of the procedures at issue, which must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care.

Creekmore, 662 F.3d at 691 (quoting Hinkley v. Koehler, 606 S.E.2d 803, 807 (Va. 2005)) (internal quotations omitted). Taken together, these two requirements of Va. Code § 8.01-581.20 focus on the "substance of an expert's background, knowledge, and practice over a particular title or form." Id. (emphasis in original).

However, Va. Code § 8.01-581.20 does not speak of the requirements for "causation" opinions. As Judge Ellis explained in Dunston, although Va. Code § 8.01-581.20 applies to "whether Dr. Abram is qualified to testify on standard of care," "no analogous Virginia statutory provision bears on the admissibility of causation testimony in medical malpractice actions, and thus, defendants' motion to exclude Dr. Abram's causation opinion is appropriately based on the Federal Rules of Evidence." 709 F. Supp.

5

2d at 429 n.9 (emphasis in original); see also Tripiciano, 2014 WL 1653073 at *4 (applying Va. Code § 8.01-581.20 to standard of care opinion only).

The Defendants argue that the combination of Va. Code § 8.01-581.20 and the Dixon v. Sublett case establishes their position. 809 S.E.2d 617 (Va. 2018). In their reply brief, the Defendants focus on the following excerpt from Katz's second expert report to demonstrate Dr. Katz's inability to testify on causation:

> In sum, had Dr. Nwaokocha not deviated from the standard of care and (1) examined Mr. Kinlaw's hand **and (2) sent Mr. Kinlaw to the emergency room so that he could be urgently seen by an orthopedist**, Mr. Kinlaw would – more likely than not – have been seen by an orthopedist, received appropriate imaging to include MRI and CT scan, and received surgery within three weeks of his injury. Dr. Nwaokocha deviated from the standard of care, and these are the reasons that he has had a poor outcome with limited range of motion[,] poor strength, poor dexterity, poor grasping abilities and pain.

ECF No. 119 at 2 (quoting Katz Second Report, ECF No. 102-4 at 22) (emphasis in original). Defendants argue that "Dr. Katz's opinion is that, by not sending Plaintiff to the ER within three weeks of his injury, Dr. Nwaokocha breached the standard of care and caused Plaintiff's ultimate injuries." Id.

The Defendants' argument under state law over-reads the requirements of Va. Code § 8.01-581.20 and the holding of Sublett. As Judge Ellis' opinion in Dunston rightly points out, there does

6

not appear to be (nor have the Defendants directed the Court to) an "analogous Virginia statutory provision [that] bears on the admissibility of causation testimony in medical malpractice actions." Dunston, 709 F. Supp. 2d at 429 n.9. Va. Code § 8.01-581.20 speaks expressly in terms of "standard of care" for medical experts, not causation. Thus, on its face, Va. Code § 8.01-581.20 does not apply to causation opinions.

Sublett stands for the proposition that, without evidence of causation, a jury verdict for medical malpractice cannot stand. Dixon v. Sublett, 809 S.E.2d at 621. In Sublett, the plaintiff had "failed to present any testimony from an expert witness to identify what a general surgeon would have done if immediately consulted about the perforated bowel." Id. The plaintiff also failed to present any evidence "on whether her outcome would have been any different had a general surgeon been immediately consulted."[3] Id. Sublett did not hold on whether the trial court had properly excluded the testimony of Sublett's expert. Indeed, Sublett does

---

[3] It appears that Sublett had tried to have her expert (an OB/GYN physician) testify about what a general surgeon might have done, but the trial judge sustained an objection by the defense, stating: "[i]t is beyond what he is proffered for. He has testified to one thing. He was offered for one thing. Now he was attempting to get into how it could have been done, how it would have been done, and that is beyond [the designation]." 809 S.E.2d at 619 (alterations in original). After Sublett's expert was prevented from testifying as to what a general surgeon would have done, she presented no other evidence on causation. See id. at 619-21; see also ECF No. 119 at 5-6.

7

not cite Va. Code § 8.01-581.20. Instead, it was a case in which there was no evidence of causation that went to the jury, and therefore the verdict could not stand. The Defendants' attempt to spin Sublett into a broader rule is unavailing.

Here, Dr. Katz, who is a "Board certified Orthopedic Surgeon," opined in his second report that "[t]he treatment provided to John Kinlaw at the Lunenburg Correctional Center in regard to his right fourth finger fracture does not meet the standard of care."[4] Katz Second Report (ECF No. 102-4 at 17). Katz opined that Dr. Nwaokocha's delays in treating Kinlaw's finger, his failure to refer him promptly to a specialist, and his improper splinting all contributed to cause Kinlaw's ultimate injury. In both

---

[4] While this Motion does not challenge the "standard of care" opinion of Dr. Katz, it is worth noting that Dr. Katz opined the following:

> The standard of care at issue is specific to the procedures that I have performed multiple times as a practicing physician within one year of Mr. Kinlaw's November 19, 2016 injury: procedures that are common to my training as an orthopedist and Dr. Nwaokocha's training as an internist and that Dr. Nwaokocha performed negligently or negligently failed to perform with regards to John Kinlaw. The standard of care at issue is also the standard of care that Dr. Nwaokocha in particular should have known as he has a licensed specialization in osteopathy—osteopathic doctors are specifically trained in musculoskeletal manipulation.

ECF No. 102-4 at 17.

depositions, Dr. Katz testified about the types of surgery Kinlaw could have received had he been promptly referred. See Katz Dep. 1 at 40-41 (ECF No. 113-1); Katz Dep. 2 at 43 (ECF No. 113-2). Katz further testified at both depositions that, had Kinlaw been promptly seen, his outcome would have been better. See Katz Dep. 1 at 35-36 (ECF No. 113-1); Katz Dep. 2 at 82 (ECF No. 113-2).

And, these opinions are contained in Katz's expert reports: "In conclusion, Mr. Kinlaw did not receive the proper and timely treatment of his right ring finger intra-articular fracture. This type of fracture should have been referred to a specialist soon after the injury and had surgery within three weeks of the injury. There were many delays in his treatment." Katz Second Report (ECF No. 102-4 at 22). Thus, unlike in Sublett, there is evidence of causation that ties Dr. Nwaokocha's conduct to Kinlaw's injuries. See also Bryan v. Burt, 486 S.E.2d 536, 540 (Va. 1997) (the "record [was] silent about the details of" care plaintiff might have received, thus failing to establish causation); Hadeed v. Medic-24, Ltd., 377 S.E.2d 589, 594 (Va. 1989) (causation was properly a jury question when jury could have reasonably concluded that bypass surgery would have increased plaintiff's chance of survival); Brown v. Koulizakis, 331 S.E.2d 440, 446 (Va. 1985) (proximate cause satisfied where "[p]rompt diagnosis of the presence of the clot. . .would have enabled the orthopedist to administer treatment. . . .").

In short, the Defendants attempt to read the combination of Va. Code § 8.01-581.20 and Sublett to create a new rule on causation. Because these authorities, read individually or in combination, do not establish that rule, the Court follows the approach in Dunston and will analyze the admissibility of the causation opinions under the Daubert standard.

### B. Dr. Katz's Causation Opinion Is Not Excluded Under the Daubert Standard

Having rejected the Defendants' argument to exclude Dr. Katz's causation opinion under state law, it is next appropriate to consider their argument that his causation opinions must be excluded under the federal Daubert standard. Their argument is twofold. First, they say that Dr. Katz's causation opinion is unreliable because he did not account for how much of Kinlaw's ultimate injury resulted from irreparable cartilage damage nor did he account for a fracture in Kinlaw's "fourth metacarpal head." ECF No. 111 at 17. The nub of this first argument is that Dr. Katz improperly performed a differential diagnosis. Second, Defendants argue that Dr. Katz did not use a reliable methodology to determine which surgery Kinlaw would have received had he been properly referred to a surgeon. This argument appears to flow from the fact that, at his second deposition, Dr. Katz discussed a different type of surgery that Kinlaw might have received than he did at his first deposition. Id. at 22-24.

Fed. R. Evid. 702 ("Rule 702") governs the admissibility of expert testimony. Under Rule 702, scientific, technical, or other specialized knowledge may be presented to the jury by an expert witness if the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." The testimony may be given in the form of an opinion or otherwise if it is "based on sufficient facts or data," it is the "product of reliable principles and methods," and if "the expert has reliably applied the principles and methods to the facts of the case." Id.

The provisions of Rule 702 reflect the decisions of the Supreme Court of the United States in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). As Daubert announced, the trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The requirement that the testimony of an expert must pertain to "scientific, technical or specialized knowledge" is intended to establish "a standard of evidentiary reliability." Id. at 590. The requirement that the testimony will assist the trier of the fact to either understand the evidence or to determine a fact in issue are conditions that go to the question of relevance. Id. at 591. Another aspect of relevance "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual

dispute." Id. That requirement is sometimes referred to as "fit," which "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. (citation omitted).

In Kumho, the Supreme Court applied the Daubert gatekeeping requirement to other expert testimony that "is not scientific in nature but that is based on the expert's knowledge and experience." James River Mgmt. Co., Inc. v. Kehoe, No.3:09cv387, 2010 WL 431477, at *2 (E.D. Va. Feb. 5, 2010) (discussing Kumho). Kumho held that the factors[5] discussed by Daubert for assessing expert testimony are relevant to this experience-based expert testimony as well; however, such factors are non-exclusive. See Kumho, 526 U.S. at 150; Kehoe, 2010 WL 431477 at *2-3.

It is up to the trial court to determine whether all or any of these factors are to be applied in assessing the reliability of the expert testimony. The gatekeeping requirement specified by Daubert is, according to Kumho, intended both to ensure "reliability and relevancy of expert testimony" and to make certain that an expert, whether basing testimony upon professional studies

---

[5] Those factors are: (1) whether a particular theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether the particular technique has a high error rate and whether there are controls for the technique; and (4) whether the technique or theory enjoys general acceptance in the scientific community. See Daubert, 509 U.S. at 592-94; see also Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (discussing these factors).

or personal experience, "employs in the courtroom the same level of intellectual rigor and characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152; Kehoe, 2010 WL 431477 at *3; see also Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195-96 (4th Cir. 2017) (summarizing gatekeeping role). With this framework in mind, it is now appropriate to turn to the Defendants' arguments.

The Defendants devote much of their Daubert briefing to addressing how Dr. Katz failed to perform a proper differential diagnosis because he did not consider the role of cartilage damage or an injury to Kinlaw's metacarpal head in determining the cause of Kinlaw's ultimate injury. ECF No. 111 at 17-22. This argument assumes that Dr. Katz performed a differential diagnosis, which (as far as the Court can ascertain) Dr. Katz never claims to have done.

It is of course true that a valid differential diagnosis is one accepted method by which an expert in a medical malpractice case can determine the cause of an injury or illness under Rule 702 and Daubert. See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262-63 (4th Cir. 1999); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199-203 (4th Cir. 2001).[6] A differential diagnosis "is a

---

[6] Cooper was a products liability case in which the plaintiff alleged that a particular device used during spinal surgery caused his failed back surgeries and negative side effects. 259 F.3d at 196-99. Westberry was a case about whether a particular talcum

13

standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Westberry, 178 F.3d at 262. A medical expert's differential diagnosis opinion should not normally be excluded "because the expert has failed to rule out every possible alternative cause of a plaintiff's illness." Cooper, 259 F.3d at 202. Alternative causes "normally affect the weight that the jury should give the expert's testimony and not admissibility of that testimony." Id. However, "if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."[7] Id.

What the Defendants fail to recognize in this case is that a differential diagnosis is but one way to determine the reliability of an expert's testimony. See Dunston, 709 F. Supp. 2d at 429-30 (noting that "a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry"); see also Daubert, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). Rather than recognize that

---

powder lubricant used in rubber gaskets caused the plaintiff's medical problems. 178 F.3d at 259-60. Neither case involved the alleged negligence of a physician in causing a plaintiff's injury.

[7] For example, in Cooper, the expert testimony was excluded where the expert failed to consider smoking as a cause of the plaintiff's botched surgery where the medical literature strongly suggested smoking played a role. See 259 F.3d at 202-203.

there are other ways to determine the reliability of Dr. Katz's causation opinion, the Defendants create a straw-man argument about a differential diagnosis (which Dr. Katz never claimed to be doing) and then argued that Dr. Katz failed to meet the standard for a differential diagnosis. However, reviewing Dr. Katz's expert report and his depositions, it is clear that Dr. Katz can provide a reliable and relevant expert opinion under Rule 702 and Daubert.

First, Dr. Katz's writes in his expert report that he is "familiar with the professional standards of medicine required and applicable to the facts and circumstances of this case and [has] treated patients with similar clinical presentation to John Kinlaw within one year of John Kinlaw's injury." Katz Second Report (ECF No. 102-4 at 23). Further, he writes that he has "been in practice for over 30 years" and is "a Board certified Orthopedic Surgeon." Id. In other words, Katz's expert report establishes Dr. Katz's basic qualifications to opine on the cause of Kinlaw's finger injury.

Second, in forming his opinion on causation, Dr. Katz performed an extensive review of Kinlaw's medical records. Twelve pages of Dr. Katz's Second Report (ECF No. 102-4 at 3-14) discuss the extensive record review that Dr. Katz performed. After reviewing this significant volume of medical records, Dr. Katz, based on his experience as a physician, was able to opine that "Mr. Kinlaw did not receive the proper and timely treatment of his

15

right ring finger intra-articular fracture" and that "[t]here were many delays in his treatment," largely the result of Dr. Nwaokocha's conduct. See Katz Second Report (ECF No. 102-4 at 22).

Dr. Katz then detailed that Dr. Nwaokocha "was aware of Mr. Kinlaw's injury the day that it happened" and that upon learning of the finger fracture, Dr. Nwaokocha had a "duty to do clinical correlation of the X-Ray report and X-Ray image by examining Mr. Kinlaw's hand as soon as possible." Id. at 18. Instead, "Dr. Nwaokocha demonstrated an attitude of indifference to Mr. Kinlaw's serious pain by failing to see Mr. Kinlaw until 11 days after Mr. Kinlaw fractured his hand" (and eight days after he knew that it was fractured from reviewing the X-Ray). Id. at 18-19. Rather than ignore Kinlaw, Dr. Katz opined that Dr. Nwaokocha should have examined his hand, properly splinted the injury, and referred Kinlaw to a doctor who could properly treat Kinlaw. See id. at 19-22. Dr. Katz then concluded that:

> Dr. Nwaokocha deviated from the standard of care, and <u>these are the reasons that [Kinlaw] has had a poor outcome with limitation in range of motion poor strength, poor dexterity, poor grasping abilities and pain</u>. [Kinlaw] has had two surgeries in regard to this fracture in order to fix his condition but continues to have problems in regard to the right ring finger and use of his right hand. Had Mr. Kinlaw been seen by an orthopedist and <u>received surgery within three weeks, Mr. Kinlaw would more likely than not have significantly greater function in his hand that would permit him to do the fine motor</u>

<u>tasks required for a job as an aviation technician.</u>

Id. (emphasis added).

Taken as a whole, Dr. Katz's report opines that Kinlaw "did not receive the proper and timely treatment of his right ring intra-articular fracture" in the immediate aftermath of his injury on November 19, 2016, and this improper treatment and delay by Nwaokocha caused Kinlaw's ultimate injuries. See id. In light of his professional expertise and experience, Dr. Katz opined that the right ring intra-articular fracture—and the delays and improper treatment of <u>that fracture</u>—is the cause of Kinlaw's ultimate injury. See Katz Dep. 2 (ECF No. 102-5 at 152-53).[8]

Defendants' theory, on the other hand, appears to be that cartilage damage alone and combined with the metacarpal head fracture caused the injury on which Kinlaw sues. According to the Defendants, these other potential causes were not known in November and December 2016, immediately after Kinlaw's injury and in the time period during which Dr. Nwaokocha allegedly delayed care and

---

[8] During Dr. Katz's second deposition, the following exchange occurred:

"Q. Your opinion is that [Kinlaw's] injuries are the direct and proximate cause of the way his intra-articular fracture to his proximal phalanx was treated, correct?

A. Correct."

ECF No. 102-5 at 152-53.

17

mistreated Kinlaw.[9] Report of Dr. Masear (ECF No. 61-1). That there might have been cartilage damage to Kinlaw's finger and the presence of a metacarpal head fracture (that did not appear on the initial X-Ray reviewed by Dr. Nwaokocha) goes to an alternative cause of Kinlaw's ultimate injuries. Dr. Katz's view of the cause of the injury is that the delays and mistreatment of the right ring intra-articular fracture caused the injuries, while the Defendants posit other causes. That there are two competing causes of injury does not require the Court to exclude one as being unreliable under Daubert. Cf. Cooper, 259 F.3d at 202 (in differential diagnosis, alternative causes of injury typically go to weight of the evidence, not admissibility).

Dr. Katz's opinion on causation was based on his review of the medical records, the depositions in the case, and his 30 years of experience as a practicing physician. There is no evidence that this methodology is improper. In such a circumstance, Dr. Katz's methodology does not support the conclusion that his opinion is unreliable. See Daubert, 509 U.S. at 595 (proper focus under Rule

---

[9] It is also worth noting that, while the record does not disclose another injury to Kinlaw's finger after the original November 19, 2016 injury, Kinlaw's deposition (and Dr. Katz's report) reveal that Dr. Nwaokocha allegedly "splinted [Kinlaw's hand] to a board after it was forcefully pushed flat." See ECF No. 102-4 at 21. In his response brief, Kinlaw all but suggests that Dr. Nwaokocha's splinting could have caused another fracture to Kinlaw's finger. ECF No. 108 at 13 n.2 ("Frankly, after the November 22 X-Ray, there is no telling what Dr. Nwaokocha's negligent care did to Mr. Kinlaw's hand. . .").

702 is on the reliability of the expert's principles and methodology used in generating an opinion, not the conclusions reached); Dunston, 709 F. Supp. 2d at 429 (same). That there are two different conclusions on causation does not call for the application of Daubert to exclude one of those conclusions. It is the jury's role at trial to determine which causation theory to believe.

Rule 702 requires the Court to play an important and necessary gatekeeping role regarding expert testimony. And, while there are factors that can be helpful in performing that duty, see Daubert, 509 U.S. at 592-94, the Supreme Court has also held that "those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." Kumho, 526 U.S. at 151; Cooper, 259 F.3d at 199 (the factors are "neither definitive, nor exhaustive"). Courts must remember that the "objective of [Daubert's gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony," and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." Kumho, 526 U.S. at 152.

There is no doubt that Dr. Katz's causation opinion is relevant in this case, and, for the reasons set forth above, it is a reliable opinion for purposes of Rule 702. Accordingly, the Daubert challenge is rejected. To the extent that the Defendants

disagree with Dr. Katz's causation opinions, they were free to cross-examine him during trial (and, indeed, they did just that fully).[10]

**CONCLUSION**

For the reasons set forth on the record during the hearing on June 26, 2019 and in this MEMORANDUM OPINION, the DEFENDANTS' MOTION TO EXCLUDE THE CAUSATION OPINIONS OF PLAINTIFF'S EXPERT, MICHAEL J. KATZ (ECF No. 101) was denied by an ORDER entered on June 27, 2019 (ECF No. 123).

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 1_9_, 2019

---

[10] Defendants' other Daubert argument—that Dr. Katz did not use a reliable methodology to determine which surgery Kinlaw might have received—also lacks merit. To the extent that this argument relies on Dr. Katz giving different answers to this question at his two depositions, that is a question for the jury about his credibility.

And, to the extent that it relies on a lack of foundation (because Dr. Katz did not personally look at an X-Ray of Kinlaw's finger from November 2016, but rather looked at the radiology report), Dr. Katz testified during his deposition: (1) that it would be appropriate to only look at the radiology report; and (2) that it would be necessary to look at the injury through an image intensifier. See ECF No. 119 at 19 (quoting Katz Dep. 2). Although the Defendants attempt to pin the latter statement on Dr. Katz to show that his opinion is unreliable, such conflicting statements do not go to admissibility, but rather weight of the evidence.

20